A95A0997, A95A1001. TORRINGTON COMPANY v. HILL et al.
(two cases).
(465 SE2d 447)

RUFFIN, Judge.

Billy Hill died when the walls of a trench in which he was working collapsed. At the time of the accident, Hill was an independent contractor working with Harold Zeigler d/b/a H & D Backhoe Service ("H & D"). H & D was hired by the Torrington Company ("Torrington") to dig a trench and install pipe on Torrington's property. In Case No. A95A0997, Hill's widow sued both H & D and Torrington for negligence, and in Case No. A95A1001 she sued only H & D, who later filed a third-party complaint against Torrington for contribution. The trial court denied Torrington's motions for summary judgment in both actions, and we granted Torrington's application for interlocutory review. Because we find that Torrington was entitled to summary judgment in both actions, we reverse.

" 'On motion for summary judgment, "the party opposing the motion is to be given the benefit of all reasonable doubts and all favorable inferences that may be drawn from the evidence. [Cits.]" [Cit.]' [Cit.]" *Brooks v. Oil-Dri Corp. of Ga.,* 205 Ga. App. 214, 215 (422 SE2d 22) (1992). Viewed in that light, the evidence shows that Torrington first hired H & D to perform trenching work in 1988. Prior

to beginning work on that project, Torrington obtained a health and safety plan prepared by Atlanta Environmental Management, Inc. ("AEM"). In a letter dated June 20, 1988, from AEM to Bruce Peake, a Torrington engineer who oversaw the 1988 project, AEM stated that "[a] copy of [the safety plan] should be given to the contractor along with an explanation of the meaning of this plan. . . . Of particular importance are the regulations regarding shoring of excavated areas and the inherent dangers therein. At a minimum, the dangers involved in trench work [include] . . . possible collapse of cut walls. . . . The health and safety plan states specifically that all individuals involved with the project will be notified that no one is to enter the trench at any time or for any reason." Similarly, a June 22, 1988 memo from AEM to Peake stated that "[a] [H]ealth and Safety Plan is integral to the safety of the work. . . . All workers involved with the project and the construction manager need to read the [plan] and sign a sheet verifying this fact." While it is undisputed that Torrington never furnished H & D or its workers with a copy of the safety plan, Zeigler admitted in his deposition that in 1988, Torrington warned H & D that "[t]here was not supposed to be anybody in the ditch . . . [and that] [t]here was no excuse to get in the ditch . . . [because] [t]here's always a chance of a cave-in." It is also undisputed that Zeigler knew there was a cave-in on the 1988 project.

Torrington hired H & D to do trenching work at an undetermined time after the 1988 project was completed and again in 1992. The 1992 project, during which Hill's accident occurred, required H & D to dig a trench, lay some piping, and connect the piping to a well casing. H & D understood that for the 1992 project, it was to provide all the labor and equipment, including safety equipment, and to supervise the construction. Zeigler testified in his deposition that he had no expectation that Torrington was going to tell them how to do the job and that he had no discussions with Torrington concerning safety measures on the job. He further testified that they did not need much safety equipment; "[w]e had the equipment on the way to do the job, and we wasn't supposed to be in the ditch. . . ." Zeigler hired Hill to lay the pipe.

A Torrington representative visited the site the day before the accident, which was when Zeigler and Hill started digging the approximately ten-foot-deep trench. The morning of the accident, Zeigler and Hill discussed two different options for connecting the pipe to the well casing. They could either go into the trench and connect the pipe from outside the well or borrow a ladder, climb down into the well, and connect the pipe from inside the well. Zeigler and Hill discussed whether there was any danger or risk of a cave-in in going into the trench, and although they believed there could be a cave-in, they decided to go into the trench. Although Zeigler remembered that Tor-

rington told them not to go into the ditch, he and Hill did not discuss Torrington's admonition. No one else took part in the decision, and Torrington was not aware that Hill would be going into the trench. After the discussion, Zeigler lowered Hill into the trench to connect a pipe to the well casing. After Hill connected the pipe, the walls of the trench caved in and killed him.

Zeigler stated in his affidavit that if Torrington had given him a copy of the 1988 safety plan, he would have followed the guidelines regarding shoring the trench. However, an AEM representative stated in his affidavit that the 1988 safety plan did not apply to the 1992 trenching project, that it was his understanding that Torrington exercised no control over the time, manner, and method of work done by Zeigler, and that the work being performed by Zeigler did not require entry into the trench by workers.

1. No factual issues remain concerning Torrington's liability, as the property owner, to Hill or H & D. "Before the owner of premises can be held liable for injuries done by reason of a defect therein to one lawfully on the premises in the employ of an independent contractor engaged by the owner to perform services on the premises, it must appear that the owner had control of the premises." (Citations and punctuation omitted.) Id. at 215-216. " 'An individual contractor is expected to determine for himself whether his place of employment is safe or unsafe, and ordinarily may not recover against the owner for injuries sustained in the performance of the contract. [Cits.]' [Cit.]" Id. at 216. While Zeigler contended in his affidavit that Torrington did not give H & D exclusive control of the work site, the only evidence he presented in support of that contention was that Torrington employees appeared at the site "for various reasons including to inspect the job." The fact that Torrington employees appeared at the site, however, does not prove that Torrington exercised control over the manner in which H & D did the work. " 'There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.' [Cit.]" *Englehart v. OKI America*, 209 Ga. App. 151, 152 (1) (a) (433 SE2d 331) (1993).

In this case, Zeigler admitted that H & D was responsible for providing all labor and equipment, including safety equipment, and for supervising the construction. Zeigler further admitted that he had no expectation that Torrington was going to tell them how to do the job and that he had no discussions with Torrington concerning safety measures on the job. The fact that Zeigler and Hill, without the presence or assistance of a Torrington representative, decided how to connect the pipe is further evidence that H & D was free to do the work its own way. " 'The evidence is clear that the premises were "surrendered" to [H & D], that [H & D's] status as an independent contractor was not "interfered" with by [Torrington], that the duty of pro-

viding for the safety of workers was accordingly upon [H & D], and that no such duty was owed by [Torrington]. [Cits.]' [Cit.]" *King v. Midas Realty Corp.*, 204 Ga. App. 590, 591 (420 SE2d 62) (1992).

2. Similarly, we find no merit in Hill's contention that Torrington is liable for the alleged negligence of H & D because Torrington had a nondelegable duty, imposed by OCGA § 51-3-1, to keep the premises and approaches safe. See OCGA § 51-2-5 (4). "[I]t is the longstanding rule in Georgia that a property owner can delegate the responsibility of maintaining a safe workplace by relinquishing possession and control of the property to an independent contractor. [Cits.]" *Englehart*, supra at 153. Since we concluded in Division 1 that Torrington surrendered possession of the work site to H & D, we conclude here that the trial court should have granted summary judgment to Torrington on Hill's claims that Torrington is vicariously liable for the alleged negligence of H & D. See id.

3. There is no evidence showing that Torrington could be liable to Hill or H & D because it had superior knowledge of the existence of a hazard on the property. The record does not support Hill's and H & D's contention that because Torrington never provided them with a copy of the 1988 safety plan, it had superior knowledge that the trenches needed to be shored to prevent a cave-in. We found no evidence controverting the AEM representative's affidavit testimony that the 1988 safety plan did not apply to the 1992 trenching project. Moreover, even if Hill and H & D could have shown that the 1988 safety plan was applicable, the evidence shows that Zeigler knew that nobody should enter the trench because of the risk of a cave-in and that he and Hill discussed this risk. It follows that Torrington did not have superior knowledge of the risk of a cave-in. See *Brooks*, supra.

Finally, the fact that Hill and Zeigler decided to enter the trench with full knowledge of the risks precludes recovery against Torrington. " 'Assumption of risk in its simplest and primary sense means that the plaintiff has given (his) express consent to relieve the defendant of an obligation of conduct toward (him) and to take (his) chance of injury from a known risk. The result is that the defendant is simply under no legal duty to protect the plaintiff. [Cits.]' [Cit.]" *Englehart*, supra at 154.

*Judgment reversed. Beasley, C. J., and Pope, P. J., concur.*

DECIDED OCTOBER 26, 1995 —
RECONSIDERATION DISMISSED DECEMBER 13, 1995 AND
RECONSIDERATION DENIED DECEMBER 13, 1995 —

*Painter, Ratterree & Bart, R. Clay Ratterree, James L. Elliott,* for appellant.

*Allgood, Childs, Mehrhof & Millians, Richard R. Mehrhof, Jr., Thompson & Smith, James M. Thompson, Larry I. Smith*, for appellees.