A02A1262. WABASH METAL PRODUCTS, INC. v. AT PLASTICS CORPORATION.
(575 SE2d 683)

SMITH, Presiding Judge.

Brent Mitchell Dyer was injured while attempting to install a piece of heavy machinery at the partially completed manufacturing facility belonging to AT Plastics Corporation (AT Plastics). Dyer sued AT Plastics, the owner of the premises, and Wabash Metal Products, Inc. (Wabash), the manufacturer of the machine press that tipped over. Both defendants filed separate motions for summary judgment. Finding genuine issues of disputed fact remaining as to Wabash's negligence, the trial court denied Wabash's motion. The trial court, however, granted summary judgment to AT Plastics, finding that its failure to provide Wabash's installation instructions to Dyer was not the proximate cause of Dyer's injuries.

In this appeal, Wabash contends that, in the absence of evidence that the machine press was top-heavy or unstable, it had no duty to warn Dyer that the press could be tipped over. Alternatively, Wabash argues that if it breached a duty to warn Dyer, then AT Plastics like-

wise did so since AT Plastics failed to provide Dyer with Wabash's shop manual, which included instructions and warnings pertaining to the installation of the press. We find no merit in either argument and affirm.

When viewed in the light most favorable to Dyer, as the nonmovant, the evidence shows that Dyer was injured when he and his supervisor, Hubert Rozier, were trying to install the machine press manufactured by Wabash and purchased by AT Plastics. At the time of the incident, Dyer was an employee of Mann Mechanical Company. KW&P, as the general contractor for the construction project, had engaged Mann Mechanical to serve as the subcontractor for the mechanical work. In its role as subcontractor, Mann Mechanical was responsible for the installation of all heavy machinery. Mann Mechanical received its instructions from KW&P, not AT Plastics.

Before shipping the press, Wabash had sent its customer, AT Plastics, a copy of the "Operation and Installation Manual" (O&I manual) for this particular machine press. Peter Connelly, the project manager for AT Plastics, received a copy of that O&I manual. However, it is undisputed that this manual gives no warning that the press is top-heavy or otherwise unstable. Nor does the O&I manual warn against the use of "cribbing" or recommend not using that method to move the press into position.[1] It is also undisputed that Wabash did not attach any warnings or affix any instructions to the press about proper moving or installation.

The machine press arrived in May, and Dyer and Rozier tried to install it in August. In the meantime, the press was moved several times without incident. On August 2, 1998, Dyer and Rozier were working overtime at AT Plastics's facility, which was still under construction. Both men were licensed journeyman pipefitters, and both had extensive experience in installing heavy equipment. Dyer testified that during his work as a pipefitter, he had helped lift, move, or transport thousands of pieces of heavy machinery. By Dyer's own calculation, he had previously moved over 100 similar pieces of equipment in his 25-year career.

Rozier asked Dyer to assist him with setting the Wabash press into its designated location in a laboratory. At that time, the press was situated on a pallet jack. Dyer and Rozier then set about to remove the press from the pallet jack and to place the press into its intended location. The press weighed 1,597.2 pounds and had the shape of a rectangular box, standing approximately 74 inches high, 36 inches wide, and 23 inches deep. The press was designed to sit flush on the floor and did not have legs.

---

[1] Cribbing involves the placing of pieces of wood or wooden blocks to raise an object from the ground.

The O&I manual was not with the press, and neither man sought to secure a copy of it or to consult with Wabash about how to move the press safely. Noting nothing unusual, Dyer and Rozier discussed the method they would use and decided to use cribbing to raise the machine, allow the removal of the pallet jack, and then lower the machine to the floor.

Dyer and Rozier raised the pallet jack and placed cribbing underneath each of the four corners of the press. Their plan was to move the press to the floor by gradually removing the wooden blocks, first on one end and then the other. Rozier had a seven-foot pinch bar, a device similar to an extremely long crowbar. Rozier succeeded in lifting the press enough to permit Dyer to remove the cribbing at one side, with the result that the press was no longer level. Intending to repeat the process on the opposite side, Rozier tried twice without success to step on the pinch bar to lift the press high enough to allow Dyer to remove the cribbing. Dyer asked Rozier to try a third time. Using an adjacent cabinet to brace himself, Rozier turned his back to the press and to Dyer and stepped down onto the pinch bar with his feet and "mashed it all the way down with my total weight." Both Dyer and Rozier testified that at that point, the press suddenly toppled over, trapping Dyer's right leg underneath.

Dyer sued Wabash, claiming that the press was defectively designed, and alleging that the press "was top-heavy and/or had a high center of gravity which caused it to fall on plaintiff during the installation process." Dyer also alleged that Wabash was negligent in failing to adequately warn him about the danger inherent in moving and tilting the press during installation. Dyer sued AT Plastics for failing to warn him of the dangers and for failing to supply him with a copy of the O&I manual.

1. Wabash contends that the trial court erred in denying its motion for summary judgment. Wabash claims that the evidence shows that the press was not top-heavy, unstable, or an inherently dangerous piece of equipment to install. "[A] duty to warn can arise even if a product is not defective." *Battersby v. Boyer*, 241 Ga. App. 115, 117 (526 SE2d 159) (1999).

A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling, the seller is not liable. Where, however, he has reason to anticipate that danger may result from a particular use, he may be required to give adequate warning of the danger, and a product sold without such warning is in a defective condition.

(Citations omitted.) Id. "Whether a duty to warn exists thus depends

upon foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger. Such matters generally are not susceptible to summary adjudication and should be resolved by a trial in the ordinary manner." (Citation and punctuation omitted.) *Yaeger v. Stith Equip. Co.*, 177 Ga. App. 835, 836 (341 SE2d 492) (1986). Moreover, the right to draw an inference of negligence lies peculiarly within the exclusive province of the jury. See *Ogletree v. Navistar Intl. Transp. Corp.*, 271 Ga. 644, 647 (522 SE2d 467) (1999).

Here, both Wabash and Dyer offered conflicting testimony as to whether the press was stable and, therefore, safe for normal handling. Wabash's director of engineering, Steven Michael, testified that nearly two-thirds of the weight of the press was located below its mid-point and that the vertical center of gravity was in the bottom of the machine. Michael specifically testified that the top half of the press weighed 596.2 pounds and the bottom half weighed 1,001 pounds. He concluded that the press was not top-heavy.

Dyer, however, presented expert testimony to support his claims that the press was unstable and that Wabash should have affixed a warning to it. Dyer submitted expert affidavits from two engineers, who relied upon drawings of the press and the depositions of witnesses, including Dyer and Rozier, to conclude that the press was unstable and dangerous to move or lift on one end. Both affidavits gave expert opinion that warnings were necessary, that the warnings provided by Wabash in its manual were inadequate, and that such warnings should have been placed on the side of the press and been provided to Dyer.

Whether the press was defectively designed and unsafe for normal handling and whether Wabash breached a duty to warn Dyer remain disputed issues requiring jury resolution. See *Ogletree*, supra. If, in fact, the press was top-heavy or unbalanced, then Wabash *may* have breached a duty to warn by not placing a warning or instructions on the press about moving and installing it or by not inserting a warning in the O&I manual for this piece of equipment. In light of the disputed evidence as to whether the press was top-heavy or a dangerous piece of equipment to move and install, summary judgment was properly denied to Wabash.

2. Wabash appeals the award of summary judgment to its co-defendant AT Plastics, but we find that the trial court did not err in granting summary judgment to AT Plastics, for two reasons. First, it appears likely that, in accordance with the terms of its construction contract, AT Plastics had fully surrendered use and control over the construction site to its general contractor, KW&P at the time of the incident. From the record provided to this Court, it appears that KW&P had control of AT Plastics's facility in August 1998 at the

time of the incident and that no employees of AT Plastics were involved in the decision-making process of moving the press. See *Torrington Co. v. Hill*, 219 Ga. App. 453, 455-456 (465 SE2d 447) (1995) (owner's surrender of work site to independent contractor absolved it of liability).

Second, even assuming without deciding that AT Plastics owed a duty to Dyer and further assuming that AT Plastics breached that duty to Dyer, no evidence shows that AT Plastics's breach, if any, was the cause of Dyer's injuries. Dyer's claim against AT Plastics hinges solely on AT Plastics's failure to provide a copy of the O&I manual for this machine press to him or his supervisor. But it is undisputed that the manual gives no warning that the press is top-heavy or otherwise unstable. And Wabash vigorously denies that the press was either top-heavy or unstable and did not state anything to the contrary in the O&I manual that Wabash provided to AT Plastics. Although the O&I manual does describe the procedure for installing the press by using a crane and rigging to lift and lower it into position, it also provides instructions for using a forklift.

Nothing in the installation instructions warns against the use of cribbing, the method being used by Dyer and Rozier to move the press into place when Dyer was injured. In fact, nowhere does the manual advise against the use of cribbing or even suggest that cribbing not be used. Rozier testified that, even if he had read the manual, he would not have done anything differently. When asked if he would install the machine in the exact same way, even today, Rozier answered in the affirmative.

Dyer's own testimony about the handling of the press is even more compelling. Dyer testified that he had used the same method — the use of cribbing to remove heavy machines from a pallet jack — "many, many, many times." During his work as a pipefitter, Dyer had helped lift, move, or transport thousands of pieces of machinery weighing more than the piece of equipment here. As to this particular piece of machinery, Dyer testified, "It was stable when we set it down on the cribbing. It was stable when we were bringing it down." Dyer testified that even if he had received the general warnings about using caution and not tilting the press on one end that are contained in the O&I manual sent by Wabash to AT Plastics, he would not have installed the press in a different manner. While it is true that Dyer did testify that he would have heeded the warnings in the manual to the extent possible, Dyer also testified that he would have installed the press exactly as he and Rozier were doing at the time that it tipped.

Finally, although Dyer originally alleged that AT Plastics was negligent in failing to provide a copy of the O&I manual to him, Dyer apparently has conceded that the information in that manual would

not have been helpful. Page 8 of Dyer's supplemental appellate brief states the following:

> Dyer agrees with AT Plastics that the manual sent by Wabash to AT Plastics contained no statements prohibiting the use of cribbing or requiring an alternative method of installation. Dyer also agrees with AT Plastics that there were no statements in the manual that the Wabash press might be top-heavy, had a high center of gravity, or may have been otherwise unstable.

Page 10 of the same brief says that "Dyer agrees with AT Plastics that the information contained in the manual is inadequate as a matter of law." Dyer goes on to concede that, if this is the case, "summary judgment in favor of AT Plastics should likely be affirmed."

Based upon these facts and Dyer's concessions, even had AT Plastics provided the O&I manual to Dyer or Rozier, the outcome would have been the same. See *Beman v. Kmart Corp.*, 232 Ga. App. 219, 221 (3) (501 SE2d 580) (1998) (plaintiff must establish a causal link between defective condition and the injury). Because Dyer's claim against AT Plastics hinges solely on AT Plastics's failure to provide the O&I manual to him, no evidence shows that AT Plastics did anything or failed to do anything that caused the press to fall onto Dyer and injure him. Or stated another way, the record contains no evidence that AT Plastics's failure to provide the O&I manual to Dyer proximately caused Dyer's injuries. See *Shadburn v. Whitlow*, 243 Ga. App. 555, 556-557 (533 SE2d 765) (2000) (absent some evidence affording a reasonable basis for establishing causation, defendant entitled to summary judgment). For these reasons, AT Plastics was entitled to judgment as a matter of law. See id.

*Judgment affirmed. Ruffin, P. J., and Ellington, J., concur. Eldridge, Barnes, JJ., and Pope, Senior Appellate Judge, concur in part and dissent in part. Andrews, P. J., concurs specially in part and dissents in part.*

ELDRIDGE, Judge, concurring in part and dissenting in part.

I concur fully in Division 1 of the majority opinion, but respectfully dissent to Division 2. As the majority correctly points out, an owner's surrender of the work site to an independent contractor will absolve it of liability. *Torrington Co. v. Hill*, 219 Ga. App. 453, 455-456 (465 SE2d 447) (1995). Nonetheless, I am unconvinced that no issue of fact remains on such issue, i.e., the record shows that the work of general contractor KW&P proceeded in the presence of senior AT Plastics personnel; that, among other responsibilities, AT Plastics' site manager had overall responsibility for safety on the work

site; and that questions concerning the installation of the press, whether from the general contractor or its subcontractors, were directed to AT Plastics' site manager or his on-site engineering process manager. Rozier, in effect, corroborated such a standard operating procedure, deposing that he and one of KW&P's site supervisors had approached AT Plastics about the desirability of putting feet on the press.

Neither am I able to conclude that no issue of fact remains as to whether the accident could have been prevented if Dyer had read Wabash's operating instructions and warnings. While Dyer's extensive deposition testimony may be deemed contradictory as to whether and to what extent he would have heeded the installation instructions for the press had AT Plastics provided them to him, Dyer ultimately deposed that he would have done so to the extent possible. Such response from Dyer, a reluctant witness who obviously took pride in his considerable experience as a pipefitter, reasonably explained the whole of his testimony as contradictory. See *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27 (343 SE2d 680) (1986) (if reasonable explanation offered for contradictory testimony, such testimony not construed against the party-witness). Therefore, AT Plastics' failure to provide Dyer the operation and installation manual for the press cannot, as a matter of law, be foreclosed as concurrently causing Dyer's injuries.

In sum, the grant of summary judgment to AT Plastics, in my view, was error and must be reversed. "A de novo standard of review applies from a grant of summary judgment, and we view the evidence, and all conclusions and inferences drawn from it, in the light most favorable to the nonmovant." *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

I am authorized to state that Judge Barnes and Senior Appellate Judge Pope join in this opinion.

ANDREWS, Presiding Judge, concurring specially in part and dissenting in part.

I respectfully dissent from the majority's conclusion that Wabash Metal Products, Inc. was not entitled to summary judgment. Wabash was entitled to summary judgment on Dyer's design defect claim because the record shows that a pipefitter hired by AT Plastics Corporation to move the subject hydraulic press used grossly excessive force to lift the press by standing on top of a lever with his entire body weight to force the press off its base. This unforeseeable application of extreme force to the press caused the press to topple off its base and was the sole proximate cause of the injury sustained by Dyer when the press fell on his leg. As to the claim that the press was defective because Wabash failed to give adequate warning of the dan-

ger involved in moving the press, Wabash was entitled to summary judgment because it was not necessary to warn Dyer or his co-workers, who were all licensed journeyman pipefitters experienced in the movement of heavy machinery and aware of the dangers, that tilting the heavy press was dangerous and could cause it to fall over. Because there was no duty to warn Dyer, I concur specially in the majority's conclusion that AT Plastics was entitled to summary judgment on Dyer's claim that it negligently failed to provide him with warnings contained in the installation manual provided by Wabash with the press.

Wabash manufactured the press and sold it to AT Plastics, and Mann Mechanical Company, a mechanical contractor, was hired to install the press at the AT Plastics facility. Dyer and his foreman, Rozier, both of whom were licensed journeyman pipefitters, were working for Mann installing the press when it fell on Dyer's leg while they were moving it into position.

Dyer sued Wabash for his injuries claiming the press was defectively designed, alleging in his complaint that it was "top-heavy and/or had a high center of gravity which caused it to fall on Plaintiff during the installation process." Dyer also alleged the press was defective because Wabash failed to adequately warn him of the danger inherent in moving and tilting the press during installation. Dyer named AT Plastics as a defendant claiming it negligently failed to provide him with a copy of the manual Wabash sent to AT Plastics along with the press which contained warnings and recommendations for installation.

Wabash moved for summary judgment and submitted an expert affidavit from its director of engineering, a mechanical engineer, who examined the press. The press was in the shape of a rectangular box standing 74 inches high and having a flat base 36 and three-quarter inches wide and 22 and one-half inches deep. The engineer measured the material used in the construction of the press and calculated that the total weight of the press was 1,597.2 pounds. He found that the weight of all the material above the vertical mid-point of the press was 596.2 pounds, and the weight of all the material below the vertical mid-point was 1,001 pounds. In other words, the bottom half of the press was about twice as heavy as the top half of the press. The affidavit demonstrated that the press was not top-heavy and had a vertical center of gravity in its bottom half.

In response to these undisputed facts, Dyer amended his complaint adding allegations that the press was "extremely unstable" and that, unknown to him, the press "could not be lifted from one end only as such lifting may cause the machine to fall over," and that the press "could not be lifted and installed in the normal, customary and ordinary way such equipment is generally installed by his profes-

sion. . . ." Dyer also submitted expert affidavits from two engineers in opposition to summary judgment. Based upon a review by the engineers of the press manual, drawings of the press, and depositions of nonexpert witnesses including Dyer and Rozier, these affidavits concluded the press was unstable and dangerous to move or lift on one end. One of the affidavits apparently reached the conclusion that, despite having a vertical center of gravity below its mid-point, the press was unstable and dangerous to move or lift because its side-to-side and front-to-back centers of gravity were off center. Both affidavits also gave expert opinion that warnings were necessary and that the warnings given by Wabash in the manual it provided with the press were inadequate because warnings should have been placed on the exterior of the press. The trial court denied summary judgment to Wabash concluding that issues of fact remained.

1. The undisputed facts showing how this accident occurred demonstrate that the trial court erred by denying summary judgment to Wabash on the defective design claim. Dyer and his foreman, Rozier, were the only persons present when the press fell on Dyer's leg. Both Dyer and Rozier testified that they are licensed journeyman pipefitters and that moving heavy machinery is a common part of their work. Dyer testified that he had moved thousands of pieces of machinery weighing in excess of 2,000 pounds. Both Dyer and Rozier were experienced in moving heavy machinery like the press at issue. According to Rozier, his pipefitting crew had already moved the press several times prior to the accident using the same method being employed by him and Dyer when the accident occurred. Rozier said the base of the press was "as flat as my bank account," and that, in order to get the press off the floor to move it by means of a pallet jack or forklift, they had to place and remove pieces of wood known as "cribbing" under the base of the press. As described by Dyer and Rozier, removal of cribbing was a process that required tilting the press in one direction, then another, to lift the base to remove the cribbing from under the press. Rozier testified that, when the press was moved prior to the accident, it was not top-heavy, or side-heavy, nor did it tilt when placed level on the floor. Dyer admitted that in moving the press to remove cribbing, the press did not appear top-heavy or dangerous. In short, all of the testimony from pipefitters who moved and tilted the press to place or remove cribbing on several occasions prior to the accident was that it was not top-heavy, excessively heavy to one side, or otherwise unstable.

Dyer and Rozier testified that the accident occurred as they were attempting to remove wooden cribbing from under the press. Standing on one foot and using his other foot to press down on a seven-foot-long pipe inserted as a lever under the base of the press, with a block of wood as a fulcrum under the pipe, Rozier had successfully tilted up

one side of the base of the press while Dyer removed the cribbing, then lowered the base down leaving that side of the press about two inches lower than the other side. Moving over to the high side of the tilted press, Rozier again inserted the lever under the base and pushed down with one foot to tilt up the base of the press. Rozier said he was only trying to raise the base a fraction of an inch to allow Dyer to remove the cribbing. Unfortunately, two attempts by Rozier to tilt the press by pushing down on the lever with his foot were unsuccessful. Rozier then turned his back to the press and to Dyer, who was leaning down by the cribbing. Using an adjacent cabinet to balance himself, Rozier stepped up on top of the lever with both feet, thereby forcing the lever down and exerting leverage up on the base of the press with the entire weight of his body. Both Dyer and Rozier testified that the press suddenly fell over at that point, trapping Dyer's right leg underneath.

The record shows that the press fell on Dyer only when grossly excessive force was applied to lift the base of the press when Rozier stood on top of the lever with his entire body weight. It was not foreseeable that an experienced pipefitter installing the press would deviate from otherwise safe and effective methods of moving and lifting the press and suddenly apply extreme force to lift the base of the press. Even assuming the expert affidavits produced by Dyer created a factual issue as to whether the press was imbalanced from side to side, the undisputed facts in this case show that, whatever that imbalance may have been, it had no practical effect on the ability of the pipefitters to tilt and move the press using the methods they employed prior to standing on the lever to tilt the base of the press. All of the evidence from the experienced pipefitters who handled, moved, and tilted the press prior to the accident was that it was not top-heavy, side-heavy, or otherwise unstable. Under these facts, it is clear that the alleged design defect played no significant role in causing the accident. Rather, the grossly excessive force applied with the lever to the base of the press was an intervening act that forcefully toppled the press off its base onto Dyer and constituted the sole proximate cause of the accident. *Ogletree v. Navistar Intl. Transp. Corp.*, 245 Ga. App. 1 (535 SE2d 545) (2000).

> It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act of someone other than the defendant, which was not foreseeable by [the] defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury.

(Citation and punctuation omitted.) *Jones v. Central of Ga. R. Co.*,

192 Ga. App. 806, 807 (386 SE2d 386) (1989); *McAuley v. Wills*, 251 Ga. 3, 7 (303 SE2d 258) (1983). Although a determination as to proximate cause is usually left to a jury, in plain and undisputed cases the court may make the determination as a matter of law. Id.; *Southern Bell Tel. &c. Co. v. Dolce*, 178 Ga. App. 175, 176 (342 SE2d 497) (1986).

This is such a plain and indisputable case. Any product having a shape similar to the subject press, whether it be a refrigerator, file cabinet, or chest of drawers, will fall over if enough force is applied to make it fall. These products are not defective because they will fall over under the application of extreme force. "[A] manufacturer is not an insurer that its product is, from a design viewpoint, incapable of producing injury." *Banks v. ICI Americas*, 264 Ga. 732, 737 (450 SE2d 671) (1994). Common sense compels the conclusion that Wabash cannot be held liable for failing to design a press which would remain upright despite the grossly excessive force applied to it in this case.

2. The trial court also erred by denying summary judgment to Wabash on Dyer's claim that the press was defective because Wabash failed to warn him and other pipefitters of the danger inherent in moving and installing the press.

A failure to warn claim is distinct from a design defect claim and can arise even if a product is not defective. *Battersby v. Boyer*, 241 Ga. App. 115, 117 (526 SE2d 159) (1999). Where a manufacturer has reason to know that danger may result from a particular use of the product, it may be required to give adequate warning of the danger, and failure to do so, where required, renders the product defective. Id. Dyer claims Wabash should have warned that the press was unstable and dangerous to move, could not be safely lifted from one end, and could not be safely moved by the usual methods used in the pipefitting profession. He claims the failure to adequately warn him was the proximate cause of the injury he suffered when the press fell on his leg.

Failure to warn claims are subject, however, to the well-recognized exception that manufacturers have no duty to warn of danger which is obvious or generally known. *Daniels v. Bucyrus-Erie Corp.*, 237 Ga. App. 828, 829 (516 SE2d 848) (1999). Related to this exception is the rule that, where a product is used by members of a particular group or profession, there is no duty to warn against risks generally known to such group or profession. Id.; *Exxon Corp. v. Jones*, 209 Ga. App. 373, 375 (433 SE2d 350) (1993). The record shows that Dyer and his foreman, Rozier, who were moving the press when it fell over, were licensed journeyman pipefitters who moved heavy machinery for a living and had experience in moving and installing thousands of pieces of heavy machinery like the subject press. Rozier testified that moving the press was "nothing out of the

ordinary." We found in *Moore v. ECI Mgmt.*, 246 Ga. App. 601, 607 (542 SE2d 115) (2000), that the trial court properly granted summary judgment to a manufacturer on a failure to warn claim because "[t]he danger of electrocution from miswiring an electrical appliance should be both open and obvious to an experienced installer." Similarly, the danger that a piece of heavy machinery could be unstable and fall over when moved or tilted is a risk generally known to experienced pipefitters. It follows that Wabash had no duty to warn Dyer and other pipefitters of that danger, even though Wabash nevertheless provided warnings in the manual it sent with the press to AT Plastics. Moreover, "[w]hen the injured party is aware of the danger, failure to warn of that danger cannot be the proximate cause of the injury." *Royal v. Ferrellgas, Inc.*, 254 Ga. App. 696, 705 (563 SE2d 451) (2002).

Because there was no duty under the circumstances to warn Dyer, it follows that AT Plastics was also entitled to summary judgment on Dyer's claim that it negligently failed to pass on the warnings contained in the installation manual provided by Wabash with the press.

DECIDED NOVEMBER 26, 2002 —
RECONSIDERATION DENIED DECEMBER 16, 2002.

*Shapiro, Fussell, Wedge, Smotherman & Martin, Robert B. Wedge, Tracey Walker*, for appellant.

*McKenna, Long & Aldridge, David N. Stern, Russell J. Rogers, Jeremy M. Moeser*, for appellee.