A07A1967. DALTON et al. v. 933 PEACHTREE, L.P. et al.
A07A1968. DALTON et al. v. GEORGIA POWER COMPANY.
A07A1969. LOPEZ v. GEORGIA POWER COMPANY.
A07A1970. LOPEZ v. 933 PEACHTREE, L.P. et al.

(661 SE2d 156)

ANDREWS, Presiding Judge.

Javier Berriel Lopez and Arthur Dalton,[1] employees of Glass Systems, Inc., the glass/window subcontractor on a condominium construction project, were severely shocked when an aluminum slab edge cover they were lifting to the fourth floor of the project, owned by 933 Peachtree, L.P., contacted high-voltage power lines operated by Georgia Power Company. In these four cases, consolidated for purposes of appeal, Lopez and Dalton appeal from the summary judgments granted to 933 Peachtree, L.P., and Georgia Power on their claims based on premises liability (933 Peachtree, L.P.) and negligence (Georgia Power).

*Case Nos. A07A1967 and A07A1970*

1. We first consider the grant of summary judgment to 933 Peachtree on Lopez and Dalton's claims based on premises liability and their second enumeration, that the trial court erred by finding no issue of material fact regarding the owner's control of the site and work.

In order to prevail on a motion for summary judgment under OCGA § 9-11-56,

the moving party must show that there exists no genuine issue of material fact, and that the undisputed facts, viewed

---

[1] Dalton's wife filed a derivative claim.

in the light most favorable to the nonmoving party, demand judgment as a matter of law. Moreover, on appeal from the denial or grant of summary judgment the appellate court is to conduct a de novo review of the evidence to determine whether there exists a genuine issue of material fact, and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Citations omitted.) *Benton v. Benton*, 280 Ga. 468, 470 (629 SE2d 204) (2006).

So viewed, the evidence was that 933 Peachtree, L.P., a limited partnership, owned the property at 933 Peachtree Street, NE in Atlanta, which it sought to develop as a multi-use retail/residential project. It entered into a Development Management Agreement with 917 Peachtree, LLC, in March 2001, whereby 917 Peachtree agreed to act as development manager for the project.

On July 10, 2001, 933 Peachtree, L.P., entered into a contract with Dunn Southeast, Inc. d/b/a R. J. Griffin and Company (Griffin) pursuant to which Griffin would act as general contractor in the construction of the project, named the Metropolis.

Appellants contend that the owner maintained control over the project during the construction process, thereby subjecting it to liability. In support of this argument, they cite some portions of the contract documents. The following provisions, however, must also be considered.

Article 3, Relationship of the Parties, states that

[t]he Contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Contractor's skill and judgment in furthering the interests of the Owner; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests. The Owner agrees to furnish and approve, in a timely manner, information required by the Contractor and to make payments to the Contractor in accordance with the requirements of the Contract Documents.

Further, the General Conditions, which are included as part of the Agreement pursuant to Article 1, provide in Section 3.3.1 that

[t]he Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. *The Contractor*

*shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures* and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters.

(Emphasis supplied.)

Article 10 of the General Conditions, Protection of Persons and Property provides in pertinent part:

> 10.2.1 The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to: .1 employees on the Work and other persons who may be affected thereby. . . .

> 10.2.3.1 The Contractor shall provide and maintain temporary protection, public utilities, etc. as required by the Contract Documents.

The project was located on Peachtree Street between 8th and 9th Streets. Running down Peachtree Street parallel to the buildings were three energized high-voltage power lines, with the closest one to the building (the field side phase) being 31 feet 8 inches high and 15 feet 5 inches from the building. The middle line (the middle phase), the one struck by plaintiffs, was 36 feet high and 18 feet from the building. Rick Breedlove, the superintendent for R. J. Griffin, notified the Utilities Protection Center (UPC) early in the construction of "Demolition/Grading/Setting Footers" work that was going to be performed by R. J. Griffin crews. This notice to UPC had nothing to do with work being performed by Glass Systems. In response to this notice, a Georgia Power engineer came to the site and determined that R. J. Griffin's proposed work would not conflict with the power lines. Pursuant to Breedlove's request, however, an orange rubber hose was placed on the field side phase in August 2001, and remained there throughout the project. Breedlove was unaware that Arthur Dalton intended to use the man-lift to lift the edge cover slabs and, had he been aware, he would have forbidden this use.

Glass Systems was the subcontractor in charge of installing the glass "skin" of the two towers being constructed.[2] Randy Dalton, appellant Arthur Dalton's brother, was the job superintendent for Glass Systems and Arthur Dalton was the foreman of one of the crews installing the glass and the aluminum frames and edge covers.

---

[2] There were a total of 25 subcontractors on the project.

Glass Systems had been on the job since late November/early December 2001. As foreman, one of Arthur Dalton's responsibilities was conducting weekly safety meetings for Glass Systems. On May 31, 2002, the topic of the safety meeting was "Electrical Safety — Overhead Wires, Ground Faults, Overcurrent Protection." Arthur Dalton was aware that workers should not come in contact with power lines and this was discussed at the May 31 meeting. Arthur Dalton was also aware that work should not be done within ten feet of a power line.

Deliveries of materials were generally made to the 8th Street side of the project. On June 14, 2002, a load of aluminum frames and 24-foot long aluminum edge cover slabs was delivered to the Peachtree Street side of the job site around 8:00 a.m. by Glass Systems. The material was off-loaded by Arthur Dalton and his crew and the slabs needed to be taken to the fourth floor. Previous practice on the job site had been for a crane to lift the slabs to the area where they were needed, but the crane was down that day. Cary Smith, another Glass Systems employee, was operating a telescoping boom Snorkle man-lift in the area. Although Smith advised Dalton that it would be safer to put the edge cover slabs in a truck and drive them up to the work area, Arthur Dalton directed his crew to place several of them on two 4 x 4's attached to the basket of the man-lift and directed Smith to lift the slabs to the fourth floor. The man-lift had never been used for the purpose before. Although he acknowledged that he had had no conversations with anyone from Georgia Power that indicated the power lines along Peachtree were not energized, Arthur Dalton said that "everybody out there . . . was under the assumption [that] these wires had been terminated, including me." Nonetheless, Smith and he discussed the fact that the power lines were close to the building, and Arthur Dalton told Smith that they should assume the power lines were live and to keep the man-lift as close to the building as possible. Smith lifted the slabs as directed and Arthur Dalton, Javier Lopez, and another worker were waiting on the fourth floor. They pulled three of the slabs off the man-lift without difficulty. When they removed the fourth slab, however, the slab either touched the power line or got close enough to it to cause an arc and Lopez and Dalton were severely shocked, suffering severe burns.

> A landowner is liable in damages to invitees who are injured on his property due to his failure to exercise ordinary care to keep the premises safe. OCGA § 51-3-1. A property owner who surrenders possession and control of its property to an independent contractor, however, generally is not liable for injuries sustained by the contractor's employ-

ees on the property due to unsafe conditions. *Grey v. Milliken & Co.*, 245 Ga. App. 804 (539 SE2d 186) (2000). Conversely, the owner or occupier may be liable for such injuries if he retains the right to direct or control the time and manner of executing the independent contractor's work or interferes with the work to a sufficient degree. Id.

*Saunders v. Industrial Metals &c.*, 285 Ga. App. 415, 417 (1) (646 SE2d 294) (2007). See also *Amear v. Hall*, 164 Ga. App. 163, 166-169 (2) (296 SE2d 611) (1982).

Here, in addition to the contract provisions relied upon by appellants, they also rely on the fact that the owner's representative had the right to visit the site, ensure the work conformed to the contract drawings and specifications, and that the owner retained the right to stop work on the project.

> "(I)t is not enough that (the owner) has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right does not mean that the contractor is controlled as to his methods of work. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." (Citations and punctuation omitted.) *Toys 'R' Us v. Atlanta Economic Dev. Corp.*, 195 Ga. App. 195, 196 (1) (A) (393 SE2d 44) (1990).

*Englehart v. OKI America*, 209 Ga. App. 151, 152 (1) (a) (433 SE2d 331) (1993).

Here, as in *Englehart*, supra, appellants have failed to show such control by 933 Peachtree and summary judgment was correctly entered in its favor on the premises liability claims. *Saunders*, supra (owner may be liable only if he retains the right to direct or control the time and manner of executing the independent contractor's work or interferes with the work to a sufficient degree); *Neiman-Marcus Group v. Dufour*, 268 Ga. App. 104, 105 (1) (601 SE2d 375) (2004) (contract contained the same language as Section 3.3.1 of the Agreement here regarding control over the work by the contractor); *Torrington Co. v. Hill*, 219 Ga. App. 453, 455 (1) (465 SE2d 447) (1995).

2. Based on our decision in Division 1, we need not consider the remaining enumeration of error raised by Lopez and Dalton.

*Case Nos. A07A1968 and A07A1969*

The trial court granted summary judgment to Georgia Power based on lack of notice pursuant to the High-voltage Safety Act (OCGA § 46-3-30 et seq.) (HVSA) and on the basis that the use of the man-lift in this fashion was unforeseeable to Georgia Power.

3. Lopez and Dalton's first and third enumerations[3] are that summary judgment to Georgia Power was error because "Georgia Power's employees stated that the lines were dead" and because, "regardless of the HVSA, Georgia Power was negligent in voluntarily providing false or misleading information about the lines to those it knew would rely on such information for their safety." Their second enumerations of error argue that the required notice was given. They are considered together.

> [The] 1992 amendment to the HVSA explicitly states that owners and operators of high-voltage lines are not liable unless notice has been given and the owner or operator of the power line has failed to effectively guard against danger by taking the appropriate safety precautions. OCGA § 46-3-39 (a). The owner-operator is immune from liability if notice was not given as required by OCGA § 46-3-34, even if the utility has not de-energized the lines. [Cits.] "The language of the HVSA is clear and unambiguous in its requirement that notice be given before work is commenced in proximity to high-voltage lines, and in its provision that lack of such notice insulates the owner of the lines from liability." *Santana[ v. Ga. Power Co.*, 269 Ga. 127, 128 (3) (498 SE2d 521) (1998)].

*Jackson Elec. Membership Corp. v. Smith*, 276 Ga. 208, 209-210 (576 SE2d 878) (2003).

First, we note that the HVSA notice given by R. J. Griffin, as set out above, was related only to the work to be performed by its workers on demolition, grading, and setting footers for the project and had nothing to do with the work performed by Glass Systems. Therefore, the argument that proper notice was given is without merit.

> OCGA § 46-3-32 (3) applies to "the person actually doing the work," so that such worker must give notice if the

---

[3] Although the factual statements in appellants' briefs are different, the enumerations of error and arguments presented are identical.

owner, contractor, or subcontractor does not give notice. Under OCGA § 46-3-32 (6), the 1992 Act redefined "work" so broadly that even occasional or casual work came within the Act. Therefore, failure to give notice for anyone doing any work within ten feet of a power line, casual worker or not, confers immunity to the power company under the Act. *Santana v. Ga. Power Co.*, supra at 128; *Preston v. Ga. Power Co.*, [227 Ga. App. 449,] 454-456 [(489 SE2d 573) (1997)]; see also generally *Flint Elec. Membership Corp. v. Ed Smith Constr. Co.*, 270 Ga. 464, 465 (511 SE2d 160) (1999) (employer who failed to give notice of worker injured by high-voltage line must indemnify power company despite workers' compensation); *Ga. Power Co. v. Franco Remodeling Co.*, 240 Ga. App. 771, 772 (2) (525 SE2d 152) (1999) (power company immune to liability without notice and is entitled to indemnity).

*Williams v. Mitchell County Elec. Membership Corp.*, 255 Ga. App. 668, 674 (2) (566 SE2d 356) (2002).

Randy Dalton, Arthur Dalton, and Javier Lopez all acknowledged that no one from Glass Systems gave notice of this use of the man-lift near the power lines to the UPC. Therefore, the trial court properly granted summary judgment to Georgia Power based on the failure to give the required notice.

Lopez's and Dalton's briefs make allegations regarding statements made by Georgia Power employees that these lines were dead; even assuming that such statements were made by Georgia Power representatives, no authority has been cited by appellants, and we are aware of none, that any such statement would obviate the requirements of the HVSA.

*Judgment affirmed in Case Nos. A07A1967, A07A1968, A07A1969, A07A1970. Ellington and Adams, JJ., concur.*

DECIDED MARCH 21, 2008 —
RECONSIDERATIONS DENIED APRIL 14, 2008.

*Kenneth W. Brosnahan, Linda G. Carpenter*, for appellants.
*Devlin & Robinson, Marvin A. Devlin, Mark E. Robinson, Rebecca C. Smith, Troutman Sanders, Scott A. Farrow, John G. Rigney*, for appellees.