**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER, and RAY, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**September 24, 2013**

# In the Court of Appeals of Georgia

A13A1361. ECO-CLEAN, INC. v. BROWN.

A13A1362. BROWN v. ECO-CLEAN, INC.

A13A1363. BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA v. BROWN.

A13A1364. BROWN v. BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA.

BARNES, Presiding Judge.

Nicholas Brown was standing on the running board of Georgia Tech's Model A mascot car while it was being driven from a fraternity house to a garage. When the car turned a corner, the handle Brown was holding detached from the car and Brown fell, striking his head on the ground. Brown sued the Board of Regents of the University System of Georgia, which owned the Georgia Tech car, and Eco-Clean, Inc., which had refurbished the car two years earlier. He asserted that the defendants were directly or vicariously liable for negligently installing or maintaining the handle

that detached from the car, that the Board of Regents negligently promoted the unsafe use of the car by students on public roads, and that the Board of Regents was vicariously liable under The Georgia Tort Claims Act, OCGA § 50-21-20 et seq., for any negligence on driver's part while he was maintaining the car on the Board's behalf.

The case was tried before a jury. After Brown rested, both defendants moved for directed verdicts, which the trial court denied. The jury awarded Brown $2 million in damages but decided that Brown was 32 percent liable for his damages, Eco Clean 34 percent liable, and the Board of Regents 34 percent liable. The trial court entered judgment against the two defendants for $680,000 each. The defendants appeal, and for the reasons that follow, we affirm.

Both defendants argue that the trial court erred in denying their motions for directed verdicts because (1) as a matter of law, Brown assumed the risk of falling and injuring himself when he rode outside the car, and (2) Brown presented insufficient evidence to establish the proper standard of care for the installation and maintenance of the handle that detached from the car. Additionally, Eco-Clean argues (3) that Brown failed to present evidence that the handle was unfit for its intended use, and the Board of Regents argues (4) that Brown presented no evidence that

2

supported a finding that the Board was liable for Brown's injuries. In cross-appeals, Brown contends that, if this court agrees with the defendants that Brown presented insufficient standard of care evidence, then the trial court erred in excluding the testimony of Brown's expert witness.

In reviewing the denial of a motion for directed verdict, we construe the evidence in the light most favorable to the prevailing party, and determine whether there is "any evidence" to support the jury's verdict. *Georgia Power Co. v. Irvin*, 267 Ga. 760, 762 (1) (482 SE2d 362) (1997). So viewed, the evidence at trial showed that the Board of Regents owned the car, but ceded control and responsibility to the "Ramblin' Reck Club," a chartered student organization. The club's purpose was to maintain and operate the car and to promote school spirit. While the club had an assigned faculty or staff advisor, the advisor was not involved in the club's day-to-day activities. According to the Dean of Students, maintenance of the car was "strictly the students' responsibility through the driver."

Club members annually elected a new driver, who had exclusive control over and responsibility for the car. Students are probationary members for the first year after they join, and gained points by participating in activities involving the car, wearing the club shirt, and washing the car, among other things. The drivers from

2007, 2008, and 2009 testified during the trial. In addition to school-sponsored events such as athletic games and parades, two of the drivers drove the car with students standing on the running board at least once a week on public roads throughout the campus, simply to raise school spirit. The car's upkeep was funded by sponsors and by renting out the car for private events such as weddings.

In 2007, the driver was pulling the Tech car on a trailer to a wedding in Savannah on a trailer when the trailer's brakes locked up. The driver's vehicle and the trailer spun 180 degrees and the trailer capsized in a ditch, totaling both the driver's vehicle and the Tech car. Because the car had been present at every Tech home football game since the school acquired the car in 1961, students and alumni were anxious to have the car repaired in time for Tech's first game of that season, which was 85 days away. Many people and companies volunteered their services to fix the car, and the driver coordinated the efforts. One company repaired the bodywork, other entities donated various small parts, and the owner of Eco-Clean's parent company, who was a Georgia Tech alumnus, volunteered Eco-Clean's services to redesign and repair the car's interior and roof.

Eco-Clean reupholstered the car seats and added soundproofing and an interior lining to the roof. Before the wreck, students standing on the car's running boards

could hold on by grasping part of the roof's wooden frame, but with the lining installed, the frame was no longer visible and could not be gripped. While Eco-Clean's manager testified that Eco-Clean did not install the interior handles, he admitted that the handles had been installed while the car was at Eco-Clean's shop, possibly by subcontractors Eco-Clean had hired to do the upholstery work. The 2009 driver, who had been closely involved in the club in 2007 when the car was repaired, testified that Eco-Clean installed the interior handles. Eco-Clean's owner testified that the company generally stood behind the work that was done at its shop. The car was repaired in time for its scheduled appearance at Tech's first home game of the 2007 season.

Brown joined the Ramblin' Reck Club in spring 2009 as a probationary member, and was dedicated to earning more points than anyone else. In April 2009, the driver, Brown, and two other club members took the car from its garage to a fraternity house where other students examined it to see if they could effect certain repairs. After the students examined the car, the driver began driving it back to the garage, less than a quarter of a mile away. Brown stood on the passenger side running board, grasping an interior handle with one hand and an exterior handle with the other, which was how he had been instructed to hold on. The driver turned on to

5

Techwood Drive from the fraternity parking lot, drove less than a block, then turned left onto Ferst Avenue. The driver heard two pops and saw Brown's hand, still grasping the handle, disappear out through the window as he fell from the running board. Brown struck his head on the road and blacked out. When the club members came to his aid, he was still holding the handle in his hand. The handle had been attached with wood screws one-half to three-quarters of an inch long, and the driver was surprised that the screws were so small.

Brown fractured his right temporal bone and was in the hospital for four days. Blood and spinal fluid drained from his ear for weeks afterward, and he experienced headaches, problems with his balance, dizziness, and nausea, all of which gradually improved. He permanently lost his senses of taste and smell, as well as his hearing in one ear, which rings constantly.

1. On appeal, both Eco-Clean and the Board of Regents argue that the trial court erred in denying their motions for directed verdict because as a matter of law Brown assumed the risk of falling from the car and being injured by standing on the running board of a moving car. Thus, they contend, Brown's assumption of the risk bars him from any recovery.

The affirmative defense of assumption of the risk bars recovery when it is established that a plaintiff, without coercion of circumstances, chooses a course of action with full knowledge of its danger and while exercising a free choice as to whether to engage in the act or not. In Georgia, a defendant asserting an assumption of the risk defense must establish that the plaintiff (1) had actual knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed himself to those risks.

(Punctuation and footnotes omitted.) *Muldovan v. McEachern*, 271 Ga. 805, 807-808 (2) (523 SE2d 566) (1999).

In this case, Eco-Clean argues that the evidence demanded a finding that Brown assumed the risk of injury and was thus barred from recovery. It points out that an eyewitness testified that the car accelerated through a red light, and argues that the car was turning "at an unusually high rate of speed" when Brown fell. Further, Eco-Clean argues that Brown assumed the risk that the handle would fail. The Board of Regents argues that Brown relied on an interior handle that was not intended to support the centrifugal force of an adult man holding on while the car turned the corner at a rate faster than it traveled at sanctioned events such as games and parades.

The defendants argue that Brown assumed the risk as a matter of law that he might fall from the running board of a moving car just as a person who "car surfs"

7

assumes the risk of falling from the car, citing *Teems v. Bates*, 300 Ga. App. 70 (684 SE2d 662) (2009). However, the posture of that case was different. There, the plaintiff was appealing a defense verdict and alleged that the trial court erred in charging the jury on the law of assumption of risk. Id. at 77 (1). We found no error because the defendant introduced at least slight evidence that the plaintiff had assumed the risk of falling and being injured by lying on the back windshield of a car and holding on to the edge of the open sunroof while the driver circled a parking lot. Id. at 71, 77.

We have held in other cases that, because "reasonable minds might disagree as to whether the fender of an automobile is such an obvious place of danger under all circumstances that a person sitting thereon would be barred from recovery as a matter of law," the issue was "ordinarily left as a question of fact for the jury rather than as a matter of law for the court." *Lassiter v. Poss*, 85 Ga. App. 785, 787-789 (1) (b) (70 SE2d 411) (1952). Similarly, whether standing on the running board of a moving car is such an assumption of risk that bars recovery may also be a jury question. *Bramlett v. Hulsey*, 98 Ga. App. 39, 41 (1) (104 SE2d 614) (1958); *Atlantic Ice & Coal Co. v. Folds*, 47 Ga. App. 832 (171 SE 581) (1933). We have held on numerous occasions that "a person is not necessarily barred of a recovery . . . merely because of the fact

that the plaintiff was riding on the fender, running board, or other exposed place on the automobile of the host driver." *Wilks v. Lingle*, 112 Ga. App. 176, 177 (3) (144 SE2d 552) (1965).

In this case, upon both defendants' requests, and over Brown's objection, the trial court charged the jury on assumption of risk. The charge properly instructed the jury that a defendant asserting an assumption of the risk defense had the burden of establishing that the plaintiff had actual knowledge of the danger, understood and appreciated the risk, and voluntarily exposed himself to the risk, but that "assumption of risk does not extend to assuming the negligent act of another." See *Little Rapids Corp. v. McCamy*, 218 Ga. App. 111, 113 (1) (460 SE2d 800) (1995).

The evidence presented did not demand a finding that Brown assumed the risk of injury as a matter of law due to improper installation of the handles or negligence of the driver. Accordingly, under the "any evidence" test, the trial court did not err in denying the defendants' motions for directed verdict based on their assumption of risk defense.

2. Both Eco-Clean and the Board of Regents argue that Brown presented no evidence establishing the standard of care to be used when installing or maintaining

a handle of this nature, and therefore failed to prove that the handle was negligently installed.

The exterior handles, which were installed on either side of the back window, were attached with bolts. Eco-Clean employees regularly installed handles in the course of their work renovating classic cars, and Eco-Clean's then-general manager had experience with how to safely install handles in a car for people to hold on to. The manager inspected the quality of handle installation by "general observation and look[ing] at the product," and he admitted observing the installation of the exterior rear handles on the Tech car.[1] In his opinion, those handles were installed safely for their intended application by using bolts, which was the proper method for installing the particular handles that he had bought. Screws would not have been a proper method for installing those handles, he testified, because the holes were threaded for machine bolts and screws would not have fit.

The trial court overruled Eco-Clean's objection to asking the manager about the difference between a bolt and a screw, concluding that a witness did not have to be an expert to answer that question. The manager explained that normally a certain

---

[1]Eco-Clean denied throughout the litigation that it had installed the interior handles, but does not dispute on appeal that there was some evidence at trial indicating that it had installed them.

type of threading requires bolts, whereas a screw is often "self-tapping," or creates its own threads in the material into which it is screwed. He agreed that the handles Eco-Clean installed on the Tech car needed to be safe enough for people to hang on to while standing on the running board, and that bolts were stronger than screws. According to the manager, the exterior handles were installed using bolts instead of screws because it was safer that way. The driver testified that he told the manager that people standing on the running board needed something robust to grab on to, which was the purpose of installing the interior handles.

Both defendants argue that this evidence was insufficient to allow the jury to conclude that the interior handles were improperly installed. But in a similar case, this court held that a jury "was authorized to conclude from the evidence that Southern Bell had installed the telephone in a negligent manner, it being common knowledge that a heavy object such as a pay telephone cannot be securely fastened to a particle board wall by ordinary wood screws." *Southern Bell Tel. &c. v. LaRoche*, 173 Ga. App. 298, 299 (1) (325 SE2d 908) (1985). No expert opinion is required when the issues are not "shrouded in the mystery of professional skill or knowledge." (Punctuation and footnote omitted.) *Bailey v. Annistown Road Baptist Church*, 301 Ga. App. 677, 689 (12) (689 SE2d 62) (2009). For example, "[t]he courts are required

11

to take notice of primary physical laws," such as the fact that an automobile is made of heavy metal and is likely to crush someone if it lands on her. *McGraw v. State*, 85 Ga. App. 857, 861 (2) (70 SE2d 141) (1952).

Similarly, whether ordinary wood screws one-half inch long were sufficient to fasten a handle for someone to hold while standing on the running board of a moving car is not an issue so shrouded in the mystery of professional skill or knowledge that expert testimony was required for a jury to understand it. Furthermore, from the testimony of Eco-Clean's manager that the company installed the exterior handles with bolts instead of screws because it was safer and was the proper method of installation, the jury was authorized to infer that bolts would likewise have been the safe and proper means for fastening the interior handles. Accordingly, the trial court did not err in denying the defendants' motions for directed verdict on this ground.

3. Eco-Clean argues that Brown failed to present sufficient evidence that the interior handle was unfit for its intended use. Basically, the company argues that it was not negligent because Brown was using the handle in a way that was not foreseeable and Brown introduced no evidence that Eco-Clean knew or should have known that the interior handle would be used by a person standing on the running

board "to anchor themselves during sharp turns at road-travel speed during an unlawful ride on the public streets."

The argument that Brown failed to introduce evidence of the handle's intended use or that the handle was improperly designed and installed echoes the assumption of risk arguments addressed in Division 1. While Eco-Clean asserts that the 2007 driver acknowledged he did not inform Eco-Clean about the handle's intended use, the question was whether the driver told Eco-Clean that the handles would be used by people standing on the running board when the car was being driven on public streets rather than during football games or parades. The driver testified subsequently that he discussed with Eco-Clean's manager that the car needed handles to give people standing on the running board "something more robust to grab onto."

Considering that the standard for appellate review of a directed verdict is the "any evidence" test, *Southern General v. Holt,* 262 Ga. 267, 268 (1) (416 SE2d 274) (1992), and construing the evidence in Brown's favor, we find no error in the trial court's denial of Eco-Clean's motion for a directed verdict on liability.

4. The Board of Regents argues that the trial court erred in dismissing its motion for a directed verdict because "Brown presented no evidence upon which a jury could have found [it] liable." In arguing that it should not be held responsible for

13

"bad decisions made by its students," the Board of Regents essentially contends that (a) Brown introduced no evidence that the Board knew or should have anticipated that students would ride on the outside of the car on a public street at times other than during a parade or school function, (b) even if the Board knew or should have known that the students rode on the outside of the car on public streets other than during parades or school functions, there was no evidence that the Board knew or should have anticipated that the interior handles had been installed defectively, and (c) the Board had no duty to protect Brown from engaging in the inherently dangerous unauthorized activity of riding on the outside of the car on public streets at times other than parades or school functions.

Brown responds that the evidence was sufficient to affirm the verdict under several different grounds of liability. The Board of Regents conceded that the driver was acting as an officer or employee of the State in maintaining the car, and because some evidence supports a finding of liability against the Board of Regents on this basis, we need not address any other grounds.

After the trial court entered a consolidated pre-trial order, the parties deposed an eyewitness to the incident who testified that the driver of the Georgia Tech car sped up and ran a red light before making the turn where Brown fell off. Based on

14

this witness's testimony, over the Board's objection, the trial court granted Brown leave to amend his complaint to allege that the Board of Regents was vicariously liable for any negligent acts or omissions of the driver. In his amended complaint, Brown alleged that "Defendant Board of Regents is vicariously liable for the acts of its employees and agents, including but not limited to officers and members of the Ramblin' Reck Club who oversaw the maintenance and repair of the Ramblin' Reck or who drove the Ramblin' Reck at the time of the incident."

Eco-Clean presented the video deposition of the eyewitness at trial, and argued that if the jury decided that Brown fell from the car because the driver ran a red light and took the turn at an excessive speed, then the Board of Regents was liable for Brown's damages rather than Eco-Clean. During the charge conference, the Board of Regents agreed that the driver was on official club business – maintaining the car owned by the Board – when Brown was injured. The driver was therefore a state officer or employee under the Tort Claims Act, OCGA § 50-21-22 (7), and sovereign immunity was waived for any torts committed by the driver while in the course and scope of his official duties or employment, per OCGA § 50-21-23 (a).[2]

_____

[2]Although the trial court charged the jury without objection that the Board was liable for the torts of its agents committed within the scope of their agency and on the law of respondeat superior and principal and agent, the legislature amended the Tort

Because some evidence introduced at the trial authorized the jury to determine that the driver of the car acted negligently while he was within the course and scope of his official duties or employment with the Board of Regents, the trial court did not err in denying the Board's motion for a directed verdict of liability. We therefore discern no basis for reversal.

*Judgment affirmed. Miller and Ray, JJ., concur.*

Claims Act to exclude "agent" from the definition of "state officer and employee," and further amended the Act to specify that independent contractors doing business with the state were not "state officers or employees." OCGA § 50-21-22 (7); *Coosa Valley Tech. College v. West*, 299 Ga. App. 171, 175-176 (2) (682 SE2d 187) (2009).