A04A0634. WINGO et al. v. HARRISON et al.
(601 SE2d 507)

ADAMS, Judge.
  In this personal injury action arising out of a collapsed deck on a private residence, the homeowners appeal the denial of their motion for summary judgment.
  A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).
  The undisputed evidence shows that in June 1999, Tazwell and Tammy Wingo purchased an eighteen-year-old home with a two-level deck.[1] The lower level was approximately five to six feet above ground, and the upper level was approximately twelve feet above ground. In connection with the purchase, the Wingos inspected the property themselves and obtained an inspection from H. K. Edwards,

---

[11] *Tyree v. Jackson*, 226 Ga. 690, 693 (1) (177 SE2d 160) (1970).

[12] *Miller v. Hands*, 188 Ga. App. 256, 258 (372 SE2d 657) (1988).

[1] We remind the bar that the Rules of the Court of Appeals require that record and transcript citations must be to the volume or part of the record or transcript and the page numbers that appear on the appellate records or transcript as sent from the court below. See Rule 27. This means that parties should not cite to the page number of a document, such as a deposition, included in the record but rather to the record page number.

Jr. of Edwards Consulting, Inc. During Edwards's inspection, Edwards remarked on some problems with the house but none regarding the deck. Specifically, there is no evidence that Edwards told the Wingos that there were any problems with the deck. Following his inspection, Edwards prepared a written report. Mr. Wingo reviewed the report completely before purchasing the property.

The report summary states, "Generally, the subject home is in good condition relative to its age, i.e. wear and tear. Some items, though appear to be in need of attention." The second page lists all "findings" that "should be discussed with your Realtor," and it identifies findings as either "MI" — Minor findings, or "MA" — "Major findings (Structure related or safety items)." Of the one major and thirteen minor findings listed on that page, not one refers to the deck. The report also contains a section entitled "Things to do after you move in," in which three items are mentioned, none of which relate to the deck.

The report then contains a ten-page list of inspected items. The "key" to the report indicates that a checkmark in the "condition" column means that an item was inspected and found acceptable, a "C" means that an item needs to be checked by a qualified equipment representative, and an "S" means that an item needs immediate correction. But a review of the list shows that in certain situations, Edwards made a different notation, for example: (1) next to "Approximate BTU Size" of the furnace, Edwards wrote "75,000"; (2) next to "Breakers/Fuses," Edwards wrote "Breakers"; (3) next to main panel location, Edwards wrote "Garage"; (4) next to "service line entrance," Edwards wrote "underground"; (5) next to "spare breakers," Edwards wrote "yes"; (6) next to "visible leaks — pipes" and "visible leaks — connections" Edwards wrote "no"; (7) next to "insulated glass," Edwards wrote "no." In many other instances, Edwards left the condition column blank. Of relevance to this case, next to "Deck(s) — Bolted to House," Edwards wrote "No." Next to "Deck(s) — Rot Observed," Edwards left the condition column blank.

Finally, the report provides the average life expectancy of 100 or more household features, and it indicates that a "Wooden deck" has a life expectancy of 15 years. But Edwards testified that he did not know whether the Wingos' deck had been part of the original house or had been added later.

In his deposition, Edwards testified that he did not notice any deck instability and that if he had he would have made an indication in his report. He also testified that the mere fact that a deck is not bolted to a house does not make it unsafe. He agreed that nailing a deck to a house was considered a safe and acceptable method of attachment in June 1999.

Other than sweeping the deck, the Wingos did not perform any maintenance or inspect the deck from the time of the purchase through the time of the accident. Mr. Wingo did, however, look at the underside of the deck occasionally while removing spider webs. He never noticed any problems other than minor paint flaking. Mrs. Wingo had also looked at the underside of the deck and had seen paint flaking, but she had never seen any signs of rot or decay.

When Mr. Wingo decided that he needed his house pressure washed, he called his friend Ron Harrison, who operated a pressure-washing business on the side. Harrison came to the Wingos' home and performed a "walk-around" of the home before deciding to do the job. On another day, he returned to pressure-wash all of the house except the deck. He was unable to do the deck because it could only be accessed from inside the house, and the Wingos' were on vacation at the time. Several months later, on September 9, 2000, Harrison returned to wash the deck. Before going onto the deck that day, Harrison had never noticed anything about the deck that caused him to believe that it might fall. Shortly after climbing the stairs from the lower to the upper deck, the deck collapsed and Harrison was injured. After the accident, both Harrison and the Wingos, based on looking at either pictures or the actual rubble of the deck, had the opinion that the wood that connected the deck to the house was rotten. But neither the Wingos nor Harrison ever observed rotten wood on the deck prior to the accident.

Harrison and his wife filed suit against the Wingos. The Wingos' motion for summary judgment was denied. We granted the Wingos' application for interlocutory review. The Wingos contend that they had no actual or constructive knowledge of a problem with the deck, that Harrison had equal knowledge about the condition of the deck, and that they fulfilled any responsibility that they had to inspect the deck.

The general rationale for the imposition of premises liability has been set forth as follows:

> One who owns or occupies land and[,] "by express or implied invitation, induces or leads others to come upon his premise for any lawful purpose, . . . is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe." OCGA § 51-3-1. While not an insurer of the invitee's safety, the owner/occupier is required to exercise ordinary care to protect the invitee from unreasonable risks of harm of which the owner/occupier has superior knowledge. The owner/occupier owes persons invited to enter the premises a duty of ordinary care to have the premises in a reasonably safe condition and

not to expose the invitees to unreasonable risk or to lead them into a dangerous trap. The owner/occupier is not required to warrant the safety of all persons from all things, but to exercise the diligence toward making the premises safe that a good business person is accustomed to use in such matters.

(Citations omitted.) *Robinson v. Kroger Co.*, 268 Ga. 735, 740 (1) (493 SE2d 403) (1997). More importantly, "the true ground of liability is the landowner's superior knowledge of the perilous condition and the danger therefrom to persons coming upon the property. It is when the perilous condition is known to the owner and not known to the person injured that a recovery is permitted." (Citation and footnote omitted.) *Moore v. ECI Mgmt.*, 246 Ga. App. 601, 602-603 (542 SE2d 115) (2000).

Here, there is no evidence in the record that the Wingos had actual or constructive knowledge of a problem with the deck. Edwards never told them that there was a problem with the deck of any kind, and his report cannot be construed as having put them on notice of a potential problem. The report does not list the deck as one of the fourteen major or minor findings or as one of the three items that required the Wingos' attention after they moved in. The fact that the "condition" column on the report was blank next to the words "Deck(s) — Rot Observed," simply cannot be construed as an indication that rot had in fact been observed. Rather, it obviously indicates that none had been.

That Edwards marked "No" in the condition column next to "Deck(s) — Bolted to House," indicates exactly that, the deck was not bolted to the house. But nothing in the report communicates the notion that not bolting a deck to the house is considered a safety or a legal problem. Moreover, the only testimony offered on the point indicates that nailing a deck to the house was acceptable in 1999 and that the mere fact that a deck is not bolted to a house does not make it unsafe. Thus, even if we were to construe the report as putting the Wingos on notice that they needed to inquire further into whether the deck *should* have been bolted to the house, the only evidence in the record is that they would have found that it was not required. Also, there is no evidence in the record to indicate that nailing the deck to the house was the cause of the failure that led to the collapse. Indeed, there is evidence of rotten wood that may have failed even if the deck had been bolted to the house.

The Harrisons contend that the Wingos were on notice that their deck exceeded the average life-span for wooden decks listed in the inspection report. First, there is no evidence in the record that the deck was in fact 18 years old. Second, even if the deck was that old, the Wingos had the deck inspected when they purchased the house, and

Edwards did not find anything wrong with it. Third, the inspection report did not indicate that anything other than ordinary diligence was required in the future. "The law only requires such diligence toward making the premises safe as the ordinarily prudent person in such matters is accustomed to use." (Citation omitted.) *Barksdale v. Nuwar*, 203 Ga. App. 184, 185 (416 SE2d 546) (1992). And, "[o]rdinary diligence may not require an inspection where the owner does not have actual knowledge of the defect and there is nothing in the character of the premises indicating a defect." (Footnote omitted.) *Pulliam v. Southern Regional Med. Center*, 241 Ga. App. 285, 286 (1) (526 SE2d 573) (1999).

Finally, there is no evidence that any possible problem with the deck, for instance rot, could have been detected even if it had been inspected. In fact, the evidence shows that both of the Wingos had looked at the underside of the deck after they purchased the property but had not seen evidence of rot, and Harrison, himself, had not noticed any rot before he got on the deck. See, e.g., *Nelson v. Polk County Historical Society*, 216 Ga. App. 756, 758-759 (3) (456 SE2d 93) (1995) (landlord not liable for injuries caused by collapse of defectively constructed awning where untrained eye would not have been able to discover defect by ordinary means); *Barksdale*, 203 Ga. App. at 185-186 (homeowner of defectively constructed deck not liable for injuries caused by deck collapse where defect was not apparent to the untrained eye).

Finally, the Harrisons also attempt to use statements that Edwards made at his deposition to the effect that nailing is "lesser of an attachment" than bolting and that an old deck needs to be monitored for future instability and maintained. But, there is no indication that he ever communicated these points to the Wingos or that they should have otherwise known of them. Also, the duty to inspect requires ordinary not extraordinary care. *Hansen v. Cooper*, 253 Ga. App. 533, 536 (559 SE2d 740) (2002).

In summary, there is no evidence that the Wingos had actual or constructive knowledge of a defect in the construction or of a condition of the deck that caused Harrison's injuries. Summary judgment should have been granted.

*Judgment reversed. Ruffin, P. J., and Eldridge, J., concur.*

DECIDED JUNE 28, 2004.

*Downey & Cleveland, Joseph C. Parker, Robert C. Harrison*, for appellants.

*Manko & Hogan, J. Stephen Manko*, for appellees.